UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BORDELON MARINE, INC. | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| ENERGY XXI GOM, LLC | § | CIVIL ACTION NO. 2:15-CV-00815 |
| | § | Hon. Mary Ann Vial Lemmon and |
| *Defendant.* | § | Hon. Sally Shushan |
| | § | |

---

## DEFENDANT ENERGY XXI GOM, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGES LEMMON AND SHUSHAN:

Plaintiff/Counter-Defendant Bordelon Marine, Inc. ("Bordelon")'s Motion for Partial Summary Judgment finds no support in the law and must be denied.

### INTRODUCTION

On January 23, 2015, the M/V CONNOR BORDELON ran into and destroyed the platform (the "Platform") owned and operated by Defendant/Counter-Plaintiff Energy XXI GOM, LLC ("EXXI"). The law is clear that EXXI is entitled to recover damages sufficient to restore it to its pre-allision position. As will be shown below such damages include: (i) the $23.44 million value of the now-inaccessible reserves;[1] (ii) the $12.7 million difference between

---

[1] EXXI is entitled to the value of the inaccessible reserves under applicable case law which upholds the availability of lost reserves in platform allision cases. Further, because the value of these now-inaccessible reserves is less than the $34.1 million in costs to replace EXXI's property which Bordelon destroyed, it is the appropriate measure of damages.

---

the costs of plugging and abandoning the wells prematurely as a result of the allision and the costs to plug and abandon the wells at the end of their useful life.   Bordelon's Motion inappropriately attempts to limit Bordelon's exposure for damages to $4.1 million or less. However, Bordelon's Motion is entirely predicated on fundamental misconceptions of both the law and the facts of this case and must be denied.

## BACKGROUND

On January 23, 2015, a vessel owned by Bordelon ran into EXXI's stationary, charted, unmanned Platform, ST 27IA.[2]   Before the allision, the Platform serviced three producing, profitable wells, the IA16, IA26, and IA27.[3]   The allision caused the Platform to catch fire and topple over, completely destroying it.[4]   The allision also caused irreparable damage to the three wells to which the Platform was connected.[5]   The allision bent all three wells' casings and caissons at or below the mud line and caused them to seep oil.[6]   To prevent continued hydrocarbon release into the Gulf of Mexico, it became necessary to plug the wells given the condition of the casings.[7]   Moreover, it was not possible to overdrive a caisson and tie back surface casing and production casing to the surface on any wells.[8]   Indeed, Bordelon's destruction of the Platform necessitated a large-scale response directed by the Bureau of Safety

---

[2] Exhibit 2, January 23, 2015 email from Bordelon to EXXI in which Bordelon apologizes for destroying the platform.
[3] *See* Exhibit 1, Affidavit of Wes Stout, ¶ 6; CONFIDENTIAL Exhibit 3, February 2015 Peer Review; CONFIDENTIAL & AEO Exhibit 4, ST27 IA Structure Reserves Valuation.   All documents identified in this Opposition as "CONFIDENTIAL" and/or "AEO" have been requested to be filed under seal contemporaneously with the filing of this Opposition.
[4] Exhibit 1, ¶ 6; Exhibit 5, pictures of Platform immediately after allision.
[5] Exhibit 1, ¶ 6; CONFIDENTIAL Exhibit 3, pp. 8-15.
[6] *Id.*
[7] *Id.*
[8] *Id.*

and Environmental Enforcement ("BSEE") to contain and remediate the environmental damages caused by Bordelon's unsafe and irresponsible operation of its vessel.[9]

According to records, inspections and third-party eye-witnesses, the Platform had all navigational aids fully functional at the time of the incident.[10]   Bordelon admits that its vessel struck EXXI's stationary platform, and, in Bordelon's own words, "we really did a number on your structure."[11]

Bordelon's destruction of both EXXI's Platform and the wells to which it was connected resulted in damages to EXXI in excess of $36 million.[12]   This amount includes: 1) the $23.4 million value of reserves lost due to the destruction of the Platform and damage to the wells and 2) the $12.7 million additional cost to plug and abandon ("P&A") the wells supported by the Platform above and beyond the amount EXXI would have spent to do this work in a non-emergency scenario at the end of the wells' useful life.[13]   Regarding the first item of damages, if EXXI's damages were measured by the costs to replace the Platform and wells, as opposed to the value of lost reserves, its damages would be approximately $31.4 million.[14]   EXXI uses the lesser figure of $23.4 million because that is most appropriate measure of damages under applicable case law, and because it conservatively *avoids* EXXI collecting a windfall.

## BORDELON'S MOTION

Bordelon's Motion seeks to dismiss Bordelon's claim for lost reserves and limit EXXI's damages to what it contends is the "'ceiling of recovery' established by the replacement costs,

---

[9] Exhibit 1, ¶ 7.
[10] Exhibit 1, ¶ 8; CONFIDENTIAL Exhibit 6, Weekly Platform Checklist; Exhibit 7, Quarterly Inspection; Exhibit 8, Statement of Gene Fontenot.
[11] Exhibit 2.
[12] Exhibit 1, ¶ 9; CONFIDENTIAL & AEO Exhibit 4; CONFIDENTIAL Exhibit 9; CONFIDENTIAL Exhibit 10, NPV Calculation of Normal P&A and Clean-Up Costs; Exhibit 13, EXXI's Second Supplemental Disclosures.
[13] *Id.*
[14] Exhibit 1, ¶ 10; CONFIDENTIAL Exhibit 11,  Platform Replacement Estimate; CONFIDENTIAL Exhibit 12, Well Replacement Scoping Cost Estimate.

less depreciation of Platform 27 IA." (Memorandum in Support of Motion, p. 15.) Bordelon's Motion posits that this ceiling is the $4.1 million in replacement costs identified by EXXI for the Platform itself, as opposed to the total replacement costs of $34.1 million identified by EXXI.

However, Bordelon's Motion, which is supported by little more than the self-serving affidavit of its own **counsel**, wholly ignores that EXXI has identified, and produced evidence supporting, the additional replacement costs of $9.9 million per well to replace the three appurtenant wells.[15] Thus, Bordelon's Motion is founded upon its mischaracterization of the "replacement costs" as being limited to $4.1 million, ***as opposed to the $34.1 million established by the evidence***.

Bordelon's Motion also ignores controlling Fifth Circuit cases as well as other district court decisions in the Circuit recognizing that the damages sought by EXXI are appropriate in this case, where Bordelon destroyed an operating oil and gas platform and its attached wells. Instead, Bordelon relies upon a case nearly three decades old involving damage to a mooring dolphin and mooring cell and its own logical leap that that case controls in all cases involving allisions with "marine structures."[16]

## STATEMENT OF LAW

The overriding goal in maritime allision cases is to place the injured party as nearly as possibly in the condition he would have occupied if the wrong had not occurred. *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976); *In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 761 (S.D. Tex. 2014). Therefore, courts in such cases have discretion to adopt

---

[15]  EXXI asks this Court to disregard the Affidavit of Bordelon's counsel Marva Wyatt, attached as Exhibit A to Bordelon's Motion, in particular with regard to paragraphs 5, 6, 7, 8, 10, 11, 12, and 15. These paragraphs lack foundation, call for speculation, and are hearsay.
[16]  A "dolphin" is a marine structure which extends above the water line and is not connected to shore. A mooring dolphin refers to such a structure which is used to provide an offshore mooring point.

any reasonable measure of damages that compensates the injured party in an effort to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred.  *Id.*

Under general maritime law, if an allision results in a "total loss" to property, the measure of damages is typically the market value of the property at the time of destruction. *Basin Expl., Inc. (Delaware) v. Tidewater, Inc.,* 353 F. Supp. 2d 662, 664 (E.D. La. 2004), aff'd, 139 Fed. Appx. 605 (5th Cir. 2005).  Property is considered an actual total loss when the property is damaged beyond physical repair.  *Id.*

As Bordelon recognizes in its Motion, where the market value of a property that is a total loss cannot be ascertained through recent and comparable sales, replacement cost is often considered the most accurate method of measuring such damage, which is recoverable whether or not the property is repaired or replaced.  *Basin Expl., Inc. (Delaware) v. Tidewater*, Inc., 353 F. Supp. 2d 662, 664 (E.D. La. 2004), aff'd, 139 Fed. Appx. 605 (5th Cir. 2005); *Pillsbury Co. v. Midland Enterprises, Inc*., 715 F. Supp. 738, 764 (E.D. La. 1989), *aff'd and remanded*, 904 F.2d 317 (5th Cir. 1990).  In addition to this amount, the full costs to P&A the wells, as well as to clean away debris, is also recoverable.  *Basin Expl., Inc.*, 353 F. Supp. 2d 662, 672 (awarding costs of cleaning away debris, and P&A in addition to replacement costs for both the damaged platform and well.)

There is no Fifth Circuit case that decides what damages are appropriate where, as here, replacement costs *exceed* the value of remaining reserves.  However, in cases where an **operational oil and gas facility**[17] is damaged, the Fifth Circuit has recognized, repeatedly, that

---

[17] Bordelon has cited a variety of cases in its Motion but the vast majority deal with destroyed vessels.  *None* of Bordelon's cases deal with destroyed working platforms.  As regards the single case Bordelon cites involving "marine structures" (a mooring dolphin and cell): *Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 763

the value of lost production can be an appropriate measure of damages, particularly when the production is lost forever rather than simply delayed. *See, e.g. Cont'l Oil Co. v. S. S. Electra,* 431 F.2d 391, 392 (5th Cir. 1970) (permitting lost profit in platform allision case and stating "Profit on oil production is simply one means of measuring the damage suffered"); *In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 761 (S.D. Tex. 2014)) (district courts have discretion to adopt any reasonable measure of damages that compensates the injured party in an effort to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred, including lost profits); *Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667, 670 (5th Cir. 1996) (distinguishing the case at hand—in which production was simply delayed— from situation in which reserves were lost, indicating that lost profits are appropriate where reserves are permanently lost); *Mobil Oil Exploration & Producing Southeast, Inc. v. Rebstock Towing Co. et al.*, C.A. No. 86–4532 c/w C.A. No. 87–456 and 86–4686 (E.D.La. December 12, 1988) (McNamara, J.) (unpublished opinion) (*accord. LLECO Holdings, Inc. v. Otto Candies, Inc.*, 867 F. Supp. 444, 448 (E.D. La. 1994), *vacated sub nom. Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667 (5th Cir. 1996) (allowing lost profits under *Electra* where, as here, well was plugged and abandoned.).

Therefore, in keeping with the overriding goal to put the owner in the position they occupied before the allision, an owner of a destroyed platform is entitled to an award comprising

---

(E.D. La. 1989), *aff'd and remanded*, 904 F.2d 317 (5th Cir. 1990) simply states the general rule acknowledged by EXXI that replacement costs is the typical measure of damages in allision cases.  None of Bordelon's cited cases address the situation where a platform owner must consider reserve values when determining whether or not to replace property.  Moreover, none of them address the situation where the replacement costs for destroyed producing property actually *exceeds* lost reserve values, as discussed *infra*, in which case lost reserves is the more appropriate and, in fact, conservative measure of damages. *See, e.g. Basin Expl., Inc. (Delaware) v. Tidewater, Inc.*, 353 F. Supp. 2d 662, 664 (E.D. La. 2004), aff'd, 139 Fed. Appx. 605 (5th Cir. 2005) and other cited cases discussed *infra*.  Moreover, in the cases cited by Bordelon, the damaged party was seeking to collect essentially replacement costs *and* loss of use of the vessel; here, EXXI *only* seeks the lesser amount (reserve value) *rather than* the higher amount (replacement costs). *See, e.g. Gaines Towing and Transportation, Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633 (5th Cir. 1999).

---

the cost to replace both the platform and wells, provided it would be economically feasible for them to replace that property in light of remaining reserves. *Basin Expl., Inc. (Delaware) v. Tidewater, Inc.*, 353 F. Supp. 2d 662, 664-65 (owner of platform and wells was entitled to cost of replacing both the platform and well given that they were total losses and replacement was economically feasible). However, if, as here, these replacement costs would *exceed* the value of remaining reserves—reserves that the owner would otherwise have been able to recover had the property not been destroyed—then the plaintiff owner instead should get the *lesser* cost to put them in a pre-allision position, *i.e.*, the value of the remaining reserves. *See id.*; *see also Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976) (explaining judge's discretion in achieving overriding goal of achieving pre-allision position); *In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 761 (S.D. Tex. 2014) (same); *S. S. Electra,* 431 F.2d 391, 392; *Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667, 670; *Mobil Oil Exploration & Producing Southeast, Inc. v. Rebstock Towing Co. et al.*, C.A. No. 86–4532 c/w C.A. No. 87–456 and 86–4686 (E.D.La. December 12, 1988) (McNamara, J.) (unpublished opinion). In such a case, lost reserves are not consequential damages, but are actual compensatory damages that represent the least amount required to make the owner whole.

## ARGUMENT

Bordelon and EXXI apparently agree that the market value of the property at the time of its destruction is the appropriate measure of damages for property loss. The parties also apparently agree that, in the absence of recent and comparable sales, replacement cost is often considered the most accurate method of measuring market value. Bordelon's assertion: (i) that damages should be limited to a mere fraction of the actual replacement costs and (ii) that no

alternate means of calculating damages exists—even when replacement costs would be *higher* than the alternate measure— is where the parties' positions depart.

**1.    Bordelon's Motion significantly understates the $34.1 million in replacement costs identified by EXXI.**

Bordelon acknowledges that the Platform was a "total loss" after the allision.  (*See* Pl. Motion, p. 7).  Indeed, it would be impossible to deny such a thing, as the vessel's allision caused the Platform to catch fire and completely collapse.[18]  However, Bordelon seems to ignore entirely that its destruction of the Platform structure itself also destroyed the three attached wells, rendering them total losses as well.  When the Platform toppled over, it caused serious damage to all three wells, bending all three wells' casings and caissons at or below the mud line, and causing them to seep oil.[19] It was thus impossible to repair the damage to the wells the allision caused.[20]  To prevent hydrocarbon release into the Gulf of Mexico, it was necessary, and required by federal regulations, to plug the wells given the condition of the casings.[21]  Moreover, it was not possible to overdrive a caisson and tie back surface casing and production casing to the surface on any wells.[22]  Based on overwhelming and undisputed evidence in this case, both the Platform **and** the three wells it services were total losses, resulting in EXXI's loss of the ability to continue its production from the entire reservoir.

In addition to $4.1 million referenced by Bordelon in estimated platform replacement costs, EXXI would have to replace the three wells themselves, which, as provided in the

---

[18] Exhibit 1, ¶ 6; Exhibit 5.
[19] Exhibit 1, ¶ 6; CONFIDENTIAL Exhibit 3.
[20] *Id.*
[21] *Id.*
[22] *Id.*

documents produced to Bordelon, was estimated to cost approximately $9.99 million *per well*.[23] Bordelon has not disputed this estimate or provided any controverting evidence in this regard.

Bordelon's Motion is premised upon its assertion that EXXI has identified its replacement costs at $4.1 million. However, EXXI has identified its replacement costs as $34.1 million. This is comprised of: (i) the $4.1 million replacement costs for the platform structure itself[24] **and** (ii) the costs to drill three new wells at $9.9 million per well ($29.7 million total).[25] Thus, to the extent that replacement costs are the appropriate measure of EXXI's property loss, that figure is $34.1 million, not the $4.1 million argued by Bordelon. Further, if Bordelon does not concede that the wells were also total losses **and** the $9.99 million per well cost to replace the wells, the extent of damages to the wells would at a minimum be a genuine dispute as to a material fact precluding summary judgment.

    **2.    Because the replacement costs exceed the value of the reserves, the value of reserves is the appropriate measure of damages.**

Rather than contending that its damages are measured by the full $34.1 million in replacement costs, EXXI's damage calculations recognize that the $23.44 million value of the now inaccessible reserves is the appropriate measure of its damages.[26] In doing so, it is *foregoing* its greater claim for the $34.1 million it would cost to replace the Platform and wells.[27] In addition, EXXI also seeks the P&A removal costs due to the allision, as clearly supported by *Basin Expl., Inc. (Delaware)*. 353 F. Supp. 2d 662, 673.

As explained in the Statement of Law section above, EXXI's damage model is the appropriate measure of damages under Fifth Circuit case law. *See id.*; *see also Freeport Sulphur*

---

[23] Exhibit 1, ¶ 10; CONFIDENTIAL Exhibit 11; CONFIDENTIAL Exhibit 12.
[24] Exhibit 1, ¶ 10; CONFIDENTIAL Exhibit 11.
[25] Exhibit 1, ¶ 10; CONFIDENTIAL Exhibit 12.
[26] *See* Exhibit 1, ¶¶ 9-10; CONFIDENTIAL & AEO Exhibit 4.
[27] *Id., see also* CONFIDENTIAL Exhibits 11-12.

*Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976); *In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 761 (S.D. Tex. 2014); *S. S. Electra,* 431 F.2d 391, 392; *Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667, 670; *Mobil Oil Exploration & Producing Southeast, Inc. v. Rebstock Towing Co. et al.*, C.A. No. 86–4532 c/w C.A. No. 87–456 and 86–4686 (E.D.La. December 12, 1988) (McNamara, J.) (unpublished opinion).

Rather than consult cases involving allisions with producing oil and gas assets, Bordelon relies upon *Pilsbury Company v. Midland Enterprises, Inc.,* 715 F.Supp. 738 (E.D.La. 1989). *Pilsbury* provides little, if any, guidance in this case.  That case involved barges which broke away from their towing vessel and struck a mooring cell and a mooring dolphin.  The case provides no discussion or analysis bearing upon the measure of damages in a case where a vessel strikes and destroys an operating oil and gas platform and connected facilities.

It is clear under the cited case law that maritime law **does not** preclude lost reserves claims.  Rather, the cases make clear that courts have discretion to adopt **any reasonable measure of damages** that compensates the injured party in an effort to place the injured person as nearly as possible in the condition he would have occupied if the wrong had not occurred. Indeed, under the circumstances present here, the value of the lost reserves are the appropriate measure of damages.  *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976); *In re ENSCO Offshore Co.*, 990 F. Supp. 2d 751, 761 (S.D. Tex. 2014).  Indeed, this Court has previously cited the Fifth Circuit's recognition that "in situations where market value cannot readily be established, the court should consider any and all evidence before it to establish a fair valuation."  See *Basin Expl., Inc.,* 353 F.Supp.2d 662 at 664, citing *Greer v. U.S.,* 505 F.2d 90, 93 (5th Cir. 1974).

Defining EXXI's damages by reference to replacement costs would actually *increase* EXXI's claim for damages, a nonsensical outcome that would provide a windfall for EXXI. Out of an abundance of caution, if the Court should conclude that Bordelon is correct on this point, EXXI would be entitled to and does request the Court award it the full $34.1 million in replacement costs.

Regardless, based on both the case law and the evidence produced in this case, EXXI's damages are **not limited** to $4.1 million, and Bordelon's Motion must accordingly be denied.

### 3. Bordelon's assertions regarding the correctness of EXXI's reserve calculations are not an appropriate summary judgment issue.

The affidavit of Bordelon's counsel submitted in support of the Motion purports to take issue with the accuracy or reliability of EXXI's evidence as to its lost reserves. (See Doc. 42-3 "Exhibit A" to Motion at Nos. 4-7). Specifically, Bordelon's counsel argues in her affidavit that EXXI's lost reserves calculations should be reduced by expected operating costs, depreciation, and capital expenditures. Bordelon appears to confuse the summary judgment procedure with cross-examination and expert discovery. To the extent that Bordelon believes it has arguments to attack the validity of EXXI's lost reserves evidence, it will have full opportunity to test the validity during depositions and trial as well as to introduce its own countervailing evidence.

### 4. If the appropriate measure of damages were replacement costs, EXXI would also be entitled to undiscounted P&A costs.

Assuming the proper measure of EXXI's damages were replacement costs, which total $34.1 million, its recoverable P&A costs would also be higher than the amount currently sought. EXXI currently seeks only the *difference* between its actual P&A and clean-up costs and the

typical costs it would have incurred at the end of useful life, for a total of $12.67 million.[28] However, where a party is recovering the cost to drill a replacement well, it may recover the full P&A and clean-up costs it incurred without any such credit for "end of useful life" P&A expenses.   *Basin Expl., Inc. (Delaware)*, 353 F. Supp. 2d 662, 673.   The rationale for this difference is that, when the replacement well is drilled, the owner becomes required to P&A both the original well and the replacement well, whereas before the allision they would have only had to P&A the original well.   *Id.*   Thus, if the Court determines that EXXI's damages are measured by its $34.1 million in replacement costs, its P&A damages would increase from the $12.68 million currently claimed to $13.43 million.

**5.     As fully briefed in connection with Bordelon's Motion for Sanctions, there is no basis to exclude evidence of EXXI's damages.**

Bordelon's Motion alternatively suggests that the Court should dismiss EXXI's claim for lost reserves in the event it grants Bordelon's motion for evidentiary sanctions.   For the reasons fully briefed in response to that motion (see Doc. 44), Bordelon's motion for evidentiary sanctions should be denied and, to the extent that it relies on the granting of that prior motion, its instant Motion should likewise be denied.   Indeed, the fact that Bordelon is again asking for dismissal of EXXI's damages claims despite the acknowledgements in its counsel's affidavit that EXXI has provided evidence supporting the claim underscores EXXI's position that Bordelon's previously filed motion for evidentiary sanctions is merely a litigation tactic.

## CONCLUSION AND PRAYER

For the foregoing reasons, EXXI respectfully requests that Bordelon's Motion for Partial Summary Judgment be denied in its entirety.

---

[28] Exhibit 13.

Respectfully submitted,

LOCKE LORD LLP

/s/ *Andrea Verney*
Jason M. Cerise, T.A. (#28526)
*ATTORNEY IN CHARGE*
Locke Lord LLP
601 Poydras Street, Suite 2660
New Orleans, Louisiana 70130
Telephone: (504) 558-5110
Facsimile: (504) 681-5223
jcerise@lockelord.com

Of Counsel *Pro Hac Vice*
Janet Militello
Texas Bar No. 14051200
S.D. Tex Federal Bar No. 2681
Chris Verducci
Texas State Bar No. 24051470
S.D. Texas Federal Bar No. 639289
Andrea Verney
Texas State Bar No. 24084018
S.D. Texas Federal Bar No. 1716893
Locke Lord LLP
600 Travis Street, Suite 2800
Houston, Texas 77002-3095
Telephone: (713) 226-1200
Facsimile:  (713) 223-3717
jmilitello@lockelord.com
cverducci@lockelord.com
averney@lockelord.com

***ATTORNEYS FOR DEFENDANT/ COUNTER-
PLAINTIFF ENERGY XXI GOM, LLC***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document is being served on all parties through their counsel of record on March 8, 2016 in accordance with the Federal Rules of Civil Procedure.

/s/ *Andrea Verney*